# Lindsay *v.* United States Savings & Loan Association, *et al.*

*Bill in Equity to redeem Real Estate, and to enjoin a Sale under a Mortgage.*

1. *Building and loan associations; act seeking to legalize past usurious transactions expository and void.*—Section 5 of the "Act to regulate the business of building and loan associations in this State," &c., approved February 7, 1893, (Acts of 1892-93, pp. 665-667), providing "that any premiums, fines or stock heretofore taken and hereafter taken to represent premiums for loans made by any building and loan association doing business in this State, shall not be treated as interest nor render such association amenable to the laws relating thereto," in so far as it relates to past transactions and seeks to declare that the premiums, fines or stock imposed and collected were not usurious, is an "expository act" and unconstitutional and void ; said statute being passed by the General Assembly only a short time after a decision of the Supreme Court declaring that under the laws of the State such transactions were usurious and that the scheme of premiums, stock taken to represent premiums and fines taken for non-payment of monthly instalments was a mere device to cover the usury, and said act approved February 7, 1893, not in any way amending, changing or repealing the law as it existed at the time of the rendition of said decision.

2. *Same; act seeking to legalize past transactions unconstitutional because subject not expressed in title.*—Section 5 of the said act approved February 7th, 1893, in so far as it seeks to legalize past transactions had with building and loan associations by purging them of the taint of usury, is unconstitutional and void, in that such subject matter is not clearly expressed in the title of the act of which it forms a part and is, therefore, violative of section 2, of Article IV of the Constitution ; since the title of said act, after reciting that it is "An act to legalize the business of building and loan associations in this State," then contains a catalogue of the contents of each section of the act, the clause referring to the 5th section reading "defining premiums, fines and stock taken to represent premiums," which title does not in any way refer to or include the subject of the legalization of past transactions.

APPEAL from from the Chancery Court of Jefferson. Heard before the Hon. THOMAS COBBS.

The appellant, Henrietta A. Lindsay, opened negotiations with the United States Savings, Loan & Building Company, a building and loan corporation of St. Paul, Minnesota, for the purpose of securing a loan from said company, and on May 17th, 1890, the negotiations were completed, and Henrietta A. Lindsay subscribed for fifty shares of stock in said company and executed to it the following note : "St. Paul, Minn., May 27, 1890. $2,500.00. For value received, after three years from date and before nine years from date, I promise to pay to the order of the United States Savings, Loan and Building Company, at the office of the treasurer, St. Paul, or to its trustees, in Minneapolis, Minn., the sum of two thousand, five hundred dollars, with interest at the rate of 6 per cent. per annum on the sum of two thousand, five hundred dollars, payable monthly. It is understood that this note is given for a loan obtained on fifty shares of stock of said United States Savings, Loan and Building Company, and if the maker hereof fails to make any monthly payment on said stock, or to pay any instalment of interest for a period of three months after the same is due, then the whole amount of this note shall become due and payable. But if the maker hereof shall pay all instalments of interest which become due hereon, and all monthly payments and fines which become due on said stock until said monthly payments shall have been past due for a period of six months, then upon the surrender of said stock to said company this note shall be deemed to be fully paid and cancelled. This note is understood to be made with reference to and under the laws of the State of Minnesota.

"HENRIETTA A. LINDSAY,
"WILLIAM M. LINDSAY."

To secure this note, Mrs. Lindsay, together with her husband, gave a mortgage upon certain real estate. This mortgage contained the following stipulations : "This mortgage being given to secure a loan made on fifty shares of stock in said United States Savings, Loan and Building Company, the monthly payments on which amount to thirty dollars ($30.00) per month, said party

of the first part doth further covenant and agree to make the said monthly payments on said stock as they shall become due until said stock becomes fully paid in, together with all fines that may accrue thereon, provided, nevertheless, that if the said party of the first part, her heirs, executors, administrators or assign shall well and truly pay or cause to be paid to the said party of the second part, its successors or assigns, at the office of its treasurer at St. Paul, Minnesota, two thousand, five hundred dollars ($2,500.00) and interest according to the conditions of one promissory note executed by Henrietta A. Lindsay and Wm. M. Lindsay, said party of the first part, to said party of the second part, bearing even date herewith, payable after three years from date, and before nine years from date, with interest on two thousand, five hundred dollars ($2,500.00), before and after maturity at the rate of six per cent. per annum until paid, interest payable monthly, or shall pay or cause to be paid to the treasurer of said company all instalments of interest which become due on said note, and all fines and monthly payments which become due on said stock until said stock becomes fully paid in, and of the value of $100 per share, and before any of said instalments of interest or monthly payments shall have been past due for a period of six months, and shall then surrender said stock to said company in payment of said note, then this deed shall be null and void, otherwise to remain in full force and effect. But if default be made in payment of the said sum or sums of money, or of any instalments of interest thereon, or of any monthly payment on said stock for a period of three months after the same shall be due, or any part of either, or in effecting the insurance or in paying the taxes or assessments at the time or times hereinbefore specified for the judgment thereof, or in any condition in this mortgage contained, then and in either or any such case, the whole principal sum or sums secured by this mortgage and the interest thereon accrued up to the time of such default, shall be at the election of said second party, its successors or assigns, or its or their agent, become thereupon due and payable immediately upon said default, and the said parties of the first part do hereby authorize and em-

power the said party of the second part, its successors or assigns, the owners hereof, its agent and attorney at its or their election, and without notice of such election, to foreclose at once this mortgage for the whole of said principal sum or sums, and accrued interest and money paid for taxes, assessments and insurance as herein provided, or to foreclose for such sum or sums, and interest and money paid as may be due and payable by the terms of said note hereby secured; and to sell the hereby said premises at public auction and convey the same to the purchaser in fee simple, agreeably to the statutes in such case made and provided, and out of the money arising from such sale to retain the principal and interest and fines then accrued on the sum or sums so elected to be foreclosed for, together with any insurance, assessments or taxes paid as above stipulated and all costs and charges of such foreclosure, including seventy-five dollars, ($75.00) attorney's fees for foreclosing this mortgage, and pay the overplus, if any, to the said party of the first part, her heirs, executors, administrators and assigns. This mortgage is understood to be made with reference to and under the laws of the State of Minnesota."

After the execution of the note, Mrs. Lindsay, up to and including March, 1893, continued to pay to said corporation the monthly instalment of $42.50, as stipulated for in the note and mortgage, $12.50 of such amount being called the interest on said loan. After March 1893, Mrs. Lindsay ceased to pay any monthly instalments, whereupon the United States Savings, Loan and Building Company declared Mrs. Lindsay in default, and acting through and by its attorney, advertised the mortgaged premises for sale on September 16, 1893. Subsequent to the execution of the note and mortgage, the name of the corporation to which they were given, was changed to that of the United States Savings & Loan Company.

The bill in this case was filed by Mrs. Lindsay against the United States Savings & Loan Company and their attorney, and after averring the facts pertaining to the negotiation of the loan, averred that the complainant had paid, and was required to pay, a usurious rate of interest for the money loaned to her.

The prayer of the bill was for an accounting between the complainant and the defendant corporation, for the purpose of ascertaining the money justly due from her, after allowing the legal rate of interest, to redeem the real estate she had mortgaged, by the payment of the amount ascertained to be due thereon, and further, that the United States Savings and Loan Company and its attorneys be enjoined from foreclosing said mortgage.

On the final submission of the cause, on the pleadings and proof, the chancellor rendered the following decree : "This cause is submitted for final decree on the pleadings and the evidence as noted by the register. On consideration it is ordered, adjudged and decreed that the complainant is entitled to redeem the property described in the bill, and that there is no usury in the note or mortgage set forth in the pleadings. It is further ordered, adjudged and decreed that it be and it is hereby referred to the register of this court to take and state an account of the amount due from the complainant to the defendant, U. S. Savings and Loan Co., and in so doing, he will charge the plaintiff with $2,500, for which said note was given, and interest thereon at the rate of six per cent. per annum from the date thereof to the time of said reference, also with all instalments (monthly payments) due on the stock of said company taken by her up to this time, and any insurance or taxes which the defendant company may have paid on said debt, and with a reasonable fee for the services of the solicitors of the defendant in this case, not to exceed the sum of $75, with interest on said several sums, and will credit her with all payments made by her, whether of interest, instalments or otherwise, and with the withdrawal value of said stock at this time."

The register made his report and the complainant filed her exceptions thereto, as follows : "1. For that the register erred in stating said account in this, that he charged the complainant with interest on $2,500 from May 27th, 1891, to September 9th, 1895, and did not allow her any credit on the partial payments made for thirty-five successive months. 2. For that the register erred in not computing interest according to the rule laid down in section 1753 of the Code of Alabama, in this, that he

should have computed the interest on the principal up to the first partial payment, applied the payment to the payment of the interest and the remainder to the payment of the principal. 3. For that the register erred in allowing to the defendant for its solicitor the sum of $75 fee, when the obligation of the complainant in evidence before the register, bound the complainant to pay such, for foreclosing said mortgage, which was done by complainant.''

On the coming in of the register's report, the chancellor overruled the complainant's exceptions and, making the corrections suggested by the defendant, confirmed the report, as shown by the following decree : ''And said report as corrected is ratified and confirmed.· And it appearing from said report that there is due by the complainant to the defendant, United States Savings and Loan Company, the sum of two thousand five hundred, forty-eight and fifty one-hundredths dollars, and it appearing from the bill that the complainant offers to do equity in the premises as may appear to be and be so adjudged by the court, it is therefore ordered, adjudged and decreed that the complainant pay to the defendant aforesaid, or his solicitors of record, said sum of $2,548.50 and the costs of said suit within thirty days from the enrolling of this decree ; and in default the register is ordered to advertise and sell said premises described in the pleadings and the mortgage at public auction before the court house door, in the city of Birmingham, Alabama, to the highest and best bidder for cash, first giving thirty day's notice of the time and place and terms of sale, by advertising once a week for four consecutive weeks in some newspaper published in said county, and he will retain out of the proceeds of sale the costs and expenses of this suit and of said sale, and apply the · remainder to the demand of the defendant aforesaid, and the balance, if any, pay to the complainant.

''It is ordered that the register make a conveyance to the purchaser upon the payment of the purchase money.

''It is ordered, adjudged and decreed that the temporary injunction heretofore granted be and the same is made perpetual.''

The complainant appeals, and assigns as error the overruling of the complainant's exceptions to the register's report and the final decree on the merits.     ·

11

[Lindsay v. United States Savings & Loan Association, *et al.*]

SAM. WILL JOHN, for appellant.—The contract evidenced by the note and mortgage, is identical in all its terms with the contract construed by this court in *Falls v. U. S. Savings Loan & B'ld'g Co.*, 97 Ala. 417, 423, 424, and re-affirmed in the case of *Lomb v. Pioneer Savings & Loan Co.*, 106 Ala. 671. The most that can be said for the act on pp. 665-7 of Acts of 1892-93, is that this "transaction is withdrawn and excepted from the operation of the general statute against usury," (*Montgomery B. & L. Asso'n v. Robinson*, 69 Ala. 420), and if this is true, it clearly violates § 23 of Art. IV of the Constitution, which provides : "Nor shall the operation of any general law be suspended by the General Assembly for the benefit of any individual, corporation or association." In construing this very clause of our Constitution, this court used this plain language : "That is a positive, unconditional limitation of the power of the General Assembly. It cannot suspend the operation of any general law, for the benefit of any individual, corporation or association. Within the range of this prohibition there is no room for the exercise of any discretion by the legislature or by the courts."—*Jones v. Jones*, 95 Ala. 450 ; *Ex parte Buckley*, 53 Ala. 54-5 ; *B'ham T. & Savings Co. v. East Lake L. Co.*, 101 Ala 307.

The construction given by the chancellor, at the instance of appellee, to this act of February 7th, 1893, makes it both retroactive and expository. A reading of section 5 clearly shows the intent to change, by legislative enactment, the construction put upon an identical contract in the *Falls Case*, by this court. If we are correct in this, then, that act is void.—Law of B'ld'g Asso'ns, Endlich, § 66 ; Cooley's Const'l Limitations, (6th ed.), pp. 110–113. If the appellee contends, as it did below, that this act operates on the remedy only, then it conflicts with the constitution.—§ 56, Art. IV.

Section 5 of the act of February 7, 1893, was an "expository" or "declaratory" statute, and therefore void. Cooley's Con. Lim. (6th ed.), pp. 110-113 ; *Sanders v. Cabaniss*, 43 Ala. 173-180 ; Endlich on B. & L. Ass'ns, § 66 ; 23 Am. & Eng. Encyc. Law, 449-450.

Unless the retrospective operation of this statute is "clearly expressed in its title," no one can affirm it is a

retrospective statute, for, to do so would be to render the whole act void, as not conforming to section 2, Art. IV of the Constitution.

WHITE & HOWZE, *contra.*—The following propositions may be accepted, as having been settled in the jurisprudence of the country: 1st. No vested right was impaired by the statute. 2d. The legislature has power to change at will, the rate of interest. 3d. What constitutes usury is within the power of the legislature. 4th. The legislature has power to relieve any contract of the taint of usury. The Supreme Court of the United States say in *Satterlee v. Mattison*, 2 Peters, 380: "It is difficult to see how a law which gives validity to a void contract can be said to impair the obligations of that contract." Again the same court say, in *Ewall v. Dagg*, 108 U. S. 143–51, that "the right of the defendant to avoid his contract is given by statute for purpose of its own and not because it affects the merits of his obligation; and that whatever the statute gives under such circumstances * * may by a subsequent statute be taken away. It is the privilege that belongs to the remedy, and forms no element in the rights that inhere in the contract. The benefit which he receives as consideration for the contract which, contrary to law, he actually made is just ground for imposing upon him by subsequent legislation the liability which he intended to incur."—108 U. S. Reports, 155; *Curtis v. Leavitt*, 15 N. Y. 1 and 229; *Danville v. Pace*, 18 Am. Rep. 669.

Legislation operating retrospectively, which renders binding and effective contracts before invalid, is not in conflict with the constitution. It neither impairs the contract nor affects vested rights.—*Tilton v. Swift*, 40 Iowa, 78–81 and cases cited; Cooley on Cons. Lim., marginal page 375, citing cases from Conn., Mass., Minn., Ill. and Indiana.

To this court belongs (so far as the validity is concerned) the sole question whether the legislative department has encroached upon the limitations fixed by the constitution. In considering such questions it will treat with the utmost deference the rights and privileges of the co-ordinate branch of the government, and will only exercise the extraordinary power which is given them to

annul said acts, after being fully convinced of their invalidity.—*Baugher v. Nelson*, 52 Am. Dec. 694–7 ; *Ex parte Mayor & Aldermen of Birmingham et al in re Powell*, 116 Ala. 186 ; *Montclair v. Ramsdell*, 107 U. S. 147 ; *Birmingham &c. v. East Lake &c.*, 101 Ala. 304 ; *Fletcher v. Peck*, 6 Cranch, 78 and 128. The title of the act is "To regulate the business of Building & Loan Associations in this State." The term "regulate" is very broad, and has been practically decided to involve every power over the subject matter short of its destruction.—20 Am. & Eng. Enc. Law, 723-4, and cases cited ; *Ex parte Boyd*, 84 Ala. 17 : *Miller v. Jones*, 80 Ala. 89 ; *Joseph v. Randolph*, 71 Ala. 50.

It is contended that this act is violative of a clause of the constitution which provides that "each law shall contain but one subject, which shall be clearly expressed in the title." This provision of the constitution was not intended to obstruct or embarrass legislation or to give rise to uncertainty as to the validity of laws affected by it.—*Stein v. Leeper*, 78 Ala. 517 ; *Wolf v. Taylor*, 98 Ala. 256 ; *Montgomery v. Robinson*, 69 Ala. 413. When the subject is expressed in general terms, whatever is referable and cognate to the general subject or whatever is necessary to complete enactment in regard to it, or whatever results as a complement to the general expression or necessary to the end in view, is included in and authorized by this constitutional provision.—*Barnhill v. Teague*, 96 Ala. 207, 210–11 ; *Ballantyne v Wickersham*, 75 Ala. 533-6 ; Cooley Cons. Lim., 170–1 ; *Ex parte Mayor & Aldermen of Birmingham in re Powell*, 116 Ala. 186 ; *City Council of Montgomery v. National B. & L. Ass'n*, 108 Ala. 336.

BRICKELL, C. J.—The bill was filed by the appellant to be let in to redeem real estate she had by mortgage conveyed to the appellee, a corporation organized and existing under the laws of the State of Minnesota, having therein its domicile or principal place of business, and to enjoin the appellee from the exercise of a power of sale contained in the mortgage. The transactions involved, in all their legal aspects, are identical with the transactions which were the subject of extended discus-

sion, deliberate consideration, and reconsideration in the case of *Falls v. U. S. Savings, Loan & Building Co.*, 97 Ala. 417. This was the first of our cases necessitating consideration and decision touching the nature or character and extent of obligation of the peculiar transactions denominated "loans"—of such frequent occurrence in recent years—had with foreign corporations of differing corporate names in designation of corporate power, franchise, and purpose. The conclusions of the court then announced were that the real transaction was a loan of money, negotiated and consummated in this State, by a mortgage of real estate here situate to secure payment, and was governed by the law of this State, though the promissory note taken from the borrower was payable in the State of the creation and domicile of the corporation, and the note and mortgage taken to secure its payment each stipulated that it was made with reference to and under the laws of the latter State; that, under the laws of this State, the transaction was usurious, a rate of interest exceeding 8 per cent. being reserved; and that the scheme of premiums, stock taken to represent premiums, and fines for non-payment of monthly instalments, was a mere shift or device to cover the usury. The course of reasoning by which these conclusions were reached it is unnecessary to repeat; but we may observe that subsequently the courts of North Carolina and Texas, after exhaustive discussion, reached similar conclusions, citing the *Falls Case* as authoritative.—*Meroney v. Loan Association*, 116 N. C. 882, 21 S E. Rep. 924, and 47 Am. St. Rep. 841; *Loan Association v. Griffin*, 90 Tex. 480, 39 S. W. Rep. 656. The legal identity of the present transaction with that which was the subject of the former decision is not controverted, it is conceded in the argument of the counsel for the appellee. The contention is, and it prevailed in the court of chancery, that the transactions have been legalized, and rendered obligatory, by subsequent legislative enactment; and the validity, interpretation, and construction of the enactment are the points to which the argument of counsel is mainly directed. The enactment forms the fifth section of an act of the General Assembly approved February 7, 1893 (Pamph. Acts 1892–93, pp. 665-667), and reads: "That any premiums, fines, or stock heretofore taken, and hereafter

taken to represent premiums for loans made by any building and loan association doing business in this State, shall not be treated as interest, nor render such association amenable to the laws relating thereto; but the said premiums, fines and stock taken to represent premiums, shall be collected as debts of like amount are now collected by law, and according to the terms and stipulations of the agreement or contract between the association and its members, and in case of any building and loan association which does not, under its methods, charge premiums of the borrower, it shall not be deemed usury that the payments shall be required monthly, when the contract on its face charges only 6 per cent. interest.'' A casual comparison of the enactment with the former decision manifests the incongruity between them, and that they can not co-exist as rules or principles by which the nature or character and obligation of the transactions may be measured. There is not a proposition announced by the former decision, now material, which is not by the enactment reversed, and, as to "premiums, fines, or stock taken to represent premiums for loans,'' without regard to the time when the transactions occurred; for in this respect, by its own words, the enactment is directed to the past as well as the future. The proposition in support of the validity of the enactment is that the constitution does not forbid legislation merely because it is retrospective; that its limitations in this respect are express, to neither of which is the enactment offensive; that the enactment has no other operation than to take from the borrower the defense of usury, and is, in its essence, remedial. We agree that the constitution contains no express inhibition of retrospective legislation; that its limitations of legislative power in this respect are expressed in article I, § 23, borrowed from the constitution of the United States, directed to *ex post facto* laws, and laws impairing the obligation of contracts, and in article IV, § 56, which reads: ''There can be no law of this State impairing the obligation of contracts by destroying or impairing the remedy for their enforcement; and the General Asssmbly shall have no power to revive any right or remedy which may have become barred by lapse of time, or any statute of this

State." Whether a statute may operate retrospectively, taking from the borrower the defense of usury, in view of our statutes, the history of our legislation, and the unbroken course of judicial decision, is a grave, far-reaching question, upon which the necessities of this case do not require the expression of an opinion. It must be admitted that whatever may have been the differences of opinion as to the nature or character and obligation of the transactions involved, and whatever of room for such differences may have existed, having passed deliberate judicial exposition and declaration, a due regard to the maxim of *stare decisis* would have compelled judicial adherence, silencing controversy. "To consider matters thus adjudged as open to reiterated discussions would lead to great public inconvenience." It would lessen confidence in the dignity and stability of the judgments of this, the court of last resort, provoking litigation or its continuance. The observations of Chancellor Kent are instructive, and have been often quoted by courts and text writers: "If a decision has been made upon solemn and mature consideration, the presumption is in favor of its correctness, and the community have a right to regard it as a just declaration or exposition of the law, and to regulate their actions by it. It would, therefore, be extremely inconvenient to the public if precedents were not duly regarded and implicitly followed." And further: "When a rule has once been deliberately adopted and declared, it ought not to be disturbed unless by a court of appeal or review, and never by the same court, except for very urgent reasons, and upon a clear manifestation of error; and, if the practice were otherwise, it would be leaving us in a perplexing uncertainty as to the law." Error is not imputed to the former decision, nor is its efficacy as a binding precedent questioned. In whatever form the proposition in support of the retrospective operation of the enactment may be expressed, when reduced to its last analysis, legislation has reversed and annulled the former decision; has done that which the courts could not have done of their own volition, without departing from settled, conservative principles, founded on the highest reasoning and the highest consideration of public policy; has declared that the

transactions are not usurious,—to employ its own words, "that any premiums, fines, or stock heretofore taken, and hereafter taken to represent premiums for loans made by any building and loan association, shall not be treated as interest, nor render such association amenable to the laws relating thereto." The enactment is its own expositor. Without repeal or modification of the statutes relating to interest and usury,—the statutes to which the former decision declared these transactions were offensive,—the enactment intervenes, and declares that, as to past or future transactions, they must not be so regarded. In form and words, the enactment is not directed as a mandate to the courts, but it is without force or meaning, unless the courts depart from the former construction of the statute, and yield obedience to it. It is, of consequence, that which is known as an "expository act." Of such statutes it is said by Judge Cooley: "As the legislature cannot set aside the construction of the law already applied by the courts to actual cases, neither can it compel the courts for the future to adopt a particular construction of a law which the legislature permits to remain in force. To declare what the law is, or has been, is a judicial power; to declare what the law shall be, is legislative. One of the fundamental principles of all our governments is that the legislative power shall be separate from the judicial. If the legislature would prescribe a different rule for the future from that which the courts enforce, it must be done by statutes, and cannot be done by a mandate to the courts, which leaves the law unchanged, but seeks to compel the courts to construe and apply it, not according to the judicial, but according to the legislative, judgment."—Cooley, Const. Lim., 114. In Endlich on Building Associations (2d ed. § 43) it is said: "An expository statute, which is substantially in the nature of a mandate to the courts to construe and apply a former law, not according to judicial, but according to legislative, judgment, is inoperative, and cannot control the courts in interpreting the law and declaring what it is. The making of statutory laws, and their exposition and application to cases as they arise, are clearly and distinctly two different functions. The former is allotted

to the legislature ; the. latter, to the courts.   Such retro-
active and expository efficacy cannot be conceded to any
law.    When, therefore, a general statute, under which
charters are granted to building associations, has re-
ceived judicial interpretation as to the nature of the
powers conferred, it is incompetent for the legislature to
change that settled interpretation by enactment ; for
the legislature has no power to direct the judiciary in
the interpretation of the acts previously passed, or to
require it to change the construction already put upon
them.    Doubts upon previous statutes may be explained
by legislative enactment, but no new interpretation
arbitrarily forced upon the judiciary, for this would be
the substitution of the language and meaning of the one
for the other.''   Several decisions of the supreme court
of Pennsylvania are cited by the author, and, of them,
the original and leading case is that of *Reiser v. Asso-
ciation*, 39 Pa. St. 137, in which an enactment similar
to the one before us was the subject of decision.   The
transactions of the association bore a resemblance to the
present transactions, and had been declared usurious by
two decisions of the supreme court.   Subsequently, the
legislature declared that the intent of the former legis-
lative acts, which had been judicially construed, was
that the transactions ''should not be deemed usurious,'' ·
and that the nominal principal and interest ''may be en-·
forced by proceedings on the securities.''   Having
analyzed and commented upon this act and the transac-
tions, the court said :  ''Here, then, is the question raised
for our consideration :  Had the legislature of 1859 any
constitutional authority to direct the judiciary depart-·
ment how it should interpret the act of 1850 and its
supplements, authorizing the incorporation of such asso-
ciations as this, and to require it to change the inter-
pretation which it had already put upon those acts, and
thus change the legal effect of contracts previously made
under them ?   We are constrained to answer this ques-
tion in the negative.  *   *   *   Leaving out unnecessary·
words of the act, it declares that the true · intent and
meaning of the act of 1850 is that this class of asso-·
ciations may, besides legal interest, take premiums on
their loans without transgressing the usury laws.   It is,
therefore, in its very terms, an expository act.   It is an

[Lindsay v. United States Savings & Loan Association, *et al.*]

interpretation by one legislature of a statute written by another legislature nine years before, and therefore an adjudication of the private rights which have arisen under it. And yet the former legislature said nothing like this, and nothing from which this could be inferred. The legislature have certainly no such authority over us as to change the laws of language. If given language does not express a given meaning, they may give us another language that does ; but this will not change the meaning of the former language. In the very nature of language, that is impossible. It is with and by virtue of the new expressions that we get the new meaning ; and, the meaning of the law being the law itself, the law can be no older than the effectual expression of it. We speak, of course, only of statute laws ; for customary or common law must be in actual operation before it can be authoritatively ascertained and expressed." In that case, as in this, the insistance of counsel for the association was that the act only repealed the usury law as to the associations referred to ; but the court said : "We should violate the plainest principles of interpretation if we should treat this clause as expressing the law that, in favor of these associations, the usury laws are abrogated. It expresses no such thing ; and the act of 1859 cannot change its nature. Arbitrary interpretation is no interpretation at all, but only the substitution of one man's language and meaning in place of the language and meaning of another. True interpretation is the ascertainment of another's meaning, from his expressions, not from their thoughts and wishes. We have no expressions in the act of 1850 to justify the interpretation put upon it by the act of 1859. Yet, we understand the legislature of 1859 is directing us to adopt this interpretation, and, therefore, to abandon the interpretation which the judiciary department of the government has declared to be the true one, and to decide according to the act of 1859 the private rights which have arisen under the act of 1850. This we cannot do." As we have said, in form and words the enactment is not directed as a mandate to the courts, nor was such the form or words of the Pennsylvania enactment. The words of the present enactment, as before recited, are that "pre-

,miums, fines, or stock heretofore taken to represent pre-miums for loans made by any building and loan associa-tion doing business in this State shall not be treated as interest, nor render such associations amenable to the laws relating thereto,'' etc. The difference in the phra-seology of the two enactments is that the Pennsylvania act declared the true intent of the former acts was that the premiums ''should not be deemed usurious.'' The purpose of each enactment, and the operation and effect of each, if a valid exercise of legislative power, are the exposition by the legislature of statutes, which it does not repeal or change, but leaves in force, and the compulsion of the courts, in the future, to adopt that construction. The operative words of the enactment are that any pre-miums, fines, or stock heretofore taken and hereafter taken to represent premiums for loans shall not be treated as interest, nor render the association amenable to the laws relating thereto, followed by the declaration that they are collectible by law. To whom is addressed the prohibition from treating them as interest, render-ing the association amenable to the laws relating there-to? The prohibition is directed to, and rests upon, the courts, not upon the parties to the transaction. Read in the light of its history, coming in but a short time after the announcement of the decision in the *Falls Case*, it is but a mandate to the courts to depart from that decision, and accept the legislative exposition of the nature or character and obligation of these transactions. We are constrained to declare that, so far as the enactment re-lates to past transactions, the legislature exceeded its powers, and assumed power the constitution commits to the judiciary exclusively.—*Carleton v. Goodwin's Ex'r*, 41 Ala. 153; *Insurance Co. v. Boykin*, 38 Ala. 510; *Greenough v. Greenough*, 11 Pa. St. 489, 51 Am. Dec. 567; *People v. Board of Sup'rs of City and County of New York*, 16 N. Y. 424; *Haley v. City of Philadelphia*, 68 Pa. St. 45, 8 Am. Rep. 153; *Titusville Iron Works v. Keystone Oil Co.*, 122 Pa. St. 627, 15 Atl. 917, and 1 Lawy. Rep. Ann. 361.

The further insistance of the appellant is that legal-izing past transactions—the purging from the taint of usury the particular transactions to which the fifth sec-tion refers—is not a subject expressed in the title of the

act of which it forms a part, and is offensive, therefore, to the clause of section 2, Art. IV, of the constitution, declaring, with exceptions it is not necessary to repeat, that "each law shall contain but one subject, which· shall be clearly expressed in the title." The title of the act is of rather peculiar construction. First, as is more usual, general words are employed to express the subject,—"To regulate the business of building and loan associations in this State." These general words are succeeded by an abstract or catalogue of the contents of the act, expressive of the matter of each section (except the repealing clause of laws in conflict with the act), descending to the section declaring that the act should take effect immediately on its passage and approval. The part or clause of the title to which the fifth section must.be referred—for there is no other to which it can be referred—reads : "Defining premiums, fines and stock taken to represent premiums." The constitution does not contemplate a multiplicity of titles ; it contemplates but one title, and leaves the form which may be given it to legislative discretion. It may be expressed in general words, or it may be a brief statement of the subject, or it may be an index to, or an abstract of, the contents of the act. The constitution is satisfied if the act has but one general subject, and that is fairly indicated by the title.—Cooley, Const. Lim. 172 ; *Ex parte Pollard*, 40 Ala. 98 ; *Ballentyne v. Wickersham*, 75 Ala. 533 ; *State v. Rogers*, 107 Ala. 444.

The purposes of the constitutional requirement must be borne steadily in mind, when it becomes necessary to determine whether there has been legislative observance of it. The exposition of these purposes by Judge Cooley is accepted, we believe, in all the States in which a like limitation prevails. They are : "*First*, to prevent 'hodgepodge' or 'logrolling' legislation ; *second*, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles give no intimation, and which might, therefore, be overlooked, and carelessly and unintentionally adopted ; and, *third*, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they

may have the opportunity of being heard thereon, by petition or otherwise, if they shall so desire."—Cooley, Const. Lim., 172. No one of these purposes is of more or less importance than the other. The mischief of hodgepodge legislation,—the inclusion in one act of matters or subjects "of a very heterogeneous nature,"—which may mislead and surprise the good faith of the law-making body; or log rolling legislation,—intended to enlist varied, and, it may be, hostile, interests, in support of the proposed act,—would have been avoided if the constitutional limitation had gone no further than the requisition that "each law shall contain but one subject." The unity of subject is an indispensable element of legislative acts; but it is not the only element; the subject must be "clearly expressed in its title." The purpose of this requisition is, as expressed in the second proposition of the exposition of Judge Cooley, "to prevent surprise or fraud upon the legislature by means of provisions in bill of which the title gives no intimation, and which might, therefore, be overlooked, and carelessly and unintentionally adopted." The third proposition must be deemed, and by all authority is deemed, of equal importance,—"to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of being heard thereon, by petition or otherwise, if they so desire." When there is fair expression of the subject in the title, all matters reasonably connected with it, and all proper agencies or instrumentalities, or measures, which will or may facilitate its accomplishment, are proper to be incorporated in the act, and, as usually said, are cognate or germane to the title. But, as was said in *Astor v. Railway Co.*, 113 N. Y. 110, 20 N. E. Rep. 598, "The title must be such, at least, as fairly to support or give a clew to the subject dealt with in the act, and, unless it comes up to this standard, it falls below the constitutional requirement." The future, and not the past, is the ordinary, usual field and scope of the legislation. "*Nova constitutio futuris forman imponere debet, non praeteritis,*"—as translated by Mr. Broom, "A legislative enactment ought to be prospective, not retrospective, in its operation,"—is the maxim

[[Lindsay v. United States Savings & Loan Association, *et al.*]

of the common law. Prospective laws—laws looking to and operating in the future—are the rule; retrospective laws, looking backward, are exceptions.—Wade on Retroactive Laws, § 1. Because the future, not the past, is the usual field and scope of operation, comes the general rule that, by construction, retroactive or retrospective operation will not be given a statute, unless its terms show clearly the legislative intention that it should have such operation.—Cooley, Const. Lim., 455; *Dash v. Van Kleek*, 7 Johns. 477, 5 Am. Dec. 291; *Perkins v. Perkins*, 7 Conn. 558, 18 Am. Dec. 120; *Baldwin v. City of Newark*, 38 N. J. Law, 158.

The intent that this section shall operate retrospectively is clearly expressed in the section itself, rendering it, as we have already said, an expository act, and a usurpation of judicial power. Is the intent expressed in the title? Does the title fairly indicate that such is the operation of the section? Does it fairly suggest or give a clew that such is the legislative intention? The general words employed as expressive of the subject, "to regulate the business of building and loan association in this State," if dissociated from the abstract or catalogue of the contents of the act, immediately following them, are of a very wide signification. They belong to a class of words, of frequent use in the title of legislative enactments, such as "to provide," "alter," "undertake," which may mislead the legislature and the public.–Ordronaux, Const. Leg. 591. If we dissociate these from the succeeding words, "defining premiums, fines, and stock taken to represent premiums," to which this section must be referred, they are not capable of a construction which would comprehend the legalization of past transactions of the association, and, of consequence, a retrospective operation to the section. In *Brunswick v. Mayor, etc.*, 51 Ga. 639, the legislature had passed an act the title of which was, "To consolidate and amend the several acts incorporating the city of Brunswick, and for other purposes therein mentioned;" and it contained a provision to make valid and confirm "all the ordinances of the mayor and city council of the city of Brunswick heretofore passed, and not in conflict with the constitution of

the State of Georgia or of the United States." It was held that it was just such legislation the constitution intended to prohibit when it excluded more than one subject matter from being embraced in the same law. We quote, as not inappropriate to the question we are considering, some of the observations of the court: "Did, the General Assembly understand, when the act to consolidate and amend the several acts incorporating the city of Brunswick was passed, that the other subject-matter embraced in it, of confirming and making valid all the acts and ordinances of the mayor and city council of Brunswick, was also made a part of the law ? Did the General Assembly have before them these ordinances which were confirmed and made valid by that act ? Did they know and understand what were the several provisions of these ordinances ? *In President, etc., of Lockport v. Gaylord,* 61 Ill. 279, the legislature passed an act entitled "An act to amend the charter of the village of Lockport, passed February 12th, A. D., 1853," the sixth section of which was as follows: "That the appropriations made by the president and trustees, and orders drawn by the clerk in February, A. D. 1867, be, and the same are hereby, fully legalized in all respects." The court said : "We do not perceive how the sixth section can be regarded as germane to the subjects expressed in the title. The legalization of unauthorized acts of the corporation cannot be considered to be amendatory of its charter. The sixth section does not profess to amend the original act of incorporation, or define the powers to be exercised by the corporation in the future. Its only possible effect is to benefit individuals who may happen to be the holders of the certificates mentioned. The object of the sixth section is not expressed in the title of the act, and we must hold that it was passed in violation of the constitution, and is therefore void." And, in the subsequent case,—*Snell v. City of Chicago,* 133 Ill. 413, 24 N. E. Rep. 532,—the same court held that the legalization of unauthorized acts was not germane to the subject expressed in the title of "An act to incorporate the Northwestern Plank-Road Company." There are statutes which may be enacted having gene    titles, and which may not by their terms show    rly the

[Lindsay v. United States Savings & Loan Association, *et al.*]

intent that they are to operate retrospectively. Remedial statutes, in regulation of judicial proceedings or in relation to the competency of witnesses, are examples. And there may be "curative," or as they are sometimes termed "healing," statutes, the subject being expressed in general terms, and may satisfy the requirement of the constitution. But, when it is proposed by an act like the present to deal with existing contracts and liabilities, there should be in the title some expression of that intention,—some indication that such is the intent,—or the purposes of the constitutional requirement are not satisfied. The law-making body, and the community at large, recognize and repose with confidence upon the idea that prospective laws—the future, and not the past—are the ordinary, usual field and scope of legislation. If there are no words in the title fairly, reasonably indicating that the act is retrospective,—that it is exceptional,—"surprise or fraud upon the legislature" cannot be prevented. Nor will the people be apprised, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, affording them opportunity of being heard thereon, if they desire, by petition or otherwise. The usual publication of the subjects of legislative consideration, during the sitting of the General Assembly, is an announcement of the titles of bills introduced, or memoranda of other matters, generally brief. It is to this publication the community at large look for information, and to the great body of the people it is the only accessible source of information. Let the title be read, and what words employed will indicate, fairly and reasonably construed, that retrospective legislation is embodied in the act,—that it was intended to cure or heal the infirmities of the past transactions of these associations ? It would defeat all the purposes of the requirement of the constitution, that the "subject shall be expressed in the title." We are not sitting in judgment to control the legislature in respect to the form or mode in which titles of enactments shall be expressed. Much must be left to legislative discretion, with which there cannot be judicial interference. But, if a title does not fairly and reasonably express the subject of the act,—if

[Hamilton & Canterbury v. Phillips Bros.]

it be misleading and deceptive,—the constitution compels its condemnation, and such, in our judgment, is the character of this title, in so far as the past transactions of the associations are attempted to be legalized.

There are several objections taken to the validity of the enactment, some of which, in relation to the title, if well taken, it may be, would annul it in its entirety; but we have not deemed it necessary to consider them, preferring, as all the necessities of the case are met, to confine ourselves to the particular questions we have considered. The chancellor, in the decree rendered, proceeded on the theory of the validity of the enactment, and that it had legalized the past transactions of the association, removing them from the influence of the *Falls Case*. For the reasons given, in that conclusion he erred; the error compelling a reversal of the decree. The mode of computing the account between the parties is indicated in the opinion in the *Falls Case*, and must be observed.

Reversed and remanded.