# Washington *v.* The State.

### *Indictment for Illegal Voting.*

1. *Elective franchise ; nature of.*—The elective franchise is a privilege rather than a right, granted or denied on grounds of public policy, and is the subject of exclusive regulation by the State, limited only by the provisions of the Fifteenth Amendment to the Federal Constitution, which prohibits any discrimination on account of "race, color, or previous condition of servitude."

2. *Same ; section 3, art. viii of State Constitution construed.*—Section 3 of article viii of the Constitution of 1875, denying the privilege of registering, voting and holding office to those "who shall have been convicted of treason, embezzlement of public funds, malfeasance in office, larceny," etc., disqualify from participation in the elective franchise all persons convicted of any one of the specified crimes prior to the adoption of the Constitution, as well as those thereafter convicted; and hence, a person convicted of larceny in 1871 may be convicted under the statute for voting at a general election held in August, 1884.

3. *Same ; section 3 art. viii of State Constitution neither ex post facto nor in nature of bill of attainder.*—Section 3 of article viii of Constitution, as thus construed, not taking away a legal right, nor imposing a legal burden, and requiring a conviction in the due course of judicial proceedings before disfranchisement, is neither an *ex post facto* law, nor a provision in the nature of a bill of attainder, within the meaning of the Federal Constitution.

APPEAL from Tuscaloosa Circuit Court.

Tried before Hon. S. H. SPROTT.

The facts are sufficiently stated in the opinion.

[Washington v. The State.]

MARTIN & MARTIN, for appellant, contended that section 3 of article 8 of the Constitution was not retroactive, but merely disqualified persons convicted of the designated crimes after its adoption.

T. N. McCLELLAND, Attorney-General, for the State.—The case comes clearly within both the letter and spirit of section 3, article 8 of the Constitution of 1875, the purpose of which was to purify the ballot box by excluding all dishonest and infamous men from participation in popular elections. To accomplish this, it must be construed to be retrospective according to its letter. The ballot is, moreover, a privilege conferred by the State, and may be conferred or taken away at pleasure. It is, in no sense, a vested right.—Cooley's Con. Lim. (5th Ed.) 752. The restriction of the right in this case is a mere qualification for suffrage, and was not intended as a punishment.—Pom. Const. Law, § 535. The case does not come within the principle decided in the cases of *Cummings* and *Garland*, 4 Wall. 277 and 333. The right to pursue a profession is a natural right; the right to vote is one acquired only by law from the State. The provision in question has no element of an *ex post facto* law, because it imposes no penalty for any thing.—McCreary on Elec. § 3; Brightley's Elec. Cases, 27.

SOMERVILLE, J.—The defendant is indicted for illegal voting at the general election held in August, 1884, and was convicted on the ground that he had voted while laboring under a constitutional disqualification, having been convicted of the crime of larceny in the year 1871. At the time of his conviction of the latter offense, he was not disqualified by this fact, the Constitution of 1868 being then in force.

Whether the present conviction for illegal voting was right or wrong depends upon the proper construction of section 3, article VIII, of the Constitution of 1875, now the organic law of this State, which reads as follows: "The following classes shall not be permitted to register, vote, or hold office:

"First. Those who *shall have been* convicted of treason, embezzlement of public funds, malfeasance in office, *larceny*, bribery, or other crime punishable by imprisonment in the penitentiary.

"Second. Those who are idiots or insane."

The grade of larceny, whether grand or petit, is immaterial, as this section has been construed by us to embrace both classes of the offense, a conviction of either operating as a disfranchisement and disqualification of every voter coming within its provisions.—*Anderson v. The State*, 72 Ala. 187.

The question for decision is, whether the section under con-

sideration applies to convictions previous to the adoption of the Constitution, or whether it must be confined to those transpiring subsequently thereto.     This is determined greatly by the policy and purpose of its provisions, and the nature of what, in common parlance, is called the right of political suffrage. It may be laid down as a sound proposition, using the language of Mr. Cooley, that "participation in the elective franchise is a *privilege* rather than a *right*, and it is granted or denied on grounds of general policy; the prevailing view being that it should be as general as possible, consistent with the public safety."—Cooley's Con. Lim. (5th Ed.) 752 (\*599).     Mr. Story, without undertaking to say whether it has its foundation in natural right or not, says. it "has always been treated in the practice of nations as a strictly *civil* right, derived from and regulated by each society according to its own free will and pleasure."—1 Story's Const. (4th Ed.) §§ 579–582.     The weight of both reason and of authority, however, as we shall see, support the view that political suffrage is not an absolute or natural right, but is a privilege conventionally conferred upon the citizen by the sovereignty.     There can be practically no such thing as universal suffrage, and it is believed that no such theory is recognized among any people.     Some are necessarily excluded. on the ground of infancy, and the privilege is infinitely varied among others, either upon the ground of public policy, or for reasons that seem arbitrary.     No one can lawfully vote under any government of laws except those who are expressly authorized by law.     It is well settled, therefore, under our form of government, that the right is one conferred by constitutions and statutes, and is the subject of exclusive regulation by the State, limited only by the provisions of the Fifteenth Amendment to the Federal Constitution, which prohibits any discrimination on account of "race, color, or previous condition of servitude."—Cooley's Cons. Lim. (5th Ed.) 752 *et seq.*; McCreary on Elec. (2d Ed.) § 3; Brightley's Elec. Cases, 27; *Huber v. Reiley*, 53 Penn. St. 112.     The States having the power to confer or to withhold the right, in such manner as the people may deem best for their welfare, it necessarily follows that they may confer it upon such conditions or qualifications as they may see fit, subject only to the limitation above mentioned.     As said in *United States v. Cruikshank*, 92 U. S. (2 Otto), 542, "the right to vote in the States comes from the States; but the right of exemption from political discrimination comes from the United States."     It is chiefly upon this theory, that the exclusion of females from the right of voting, although they are deemed citizens, is justified in law, this not being necessarily a privilege or immunity of citizenship. *Minor v. Happersett*, 21 Wall. 162; Morse on Citizenship, § 3.

The right is also denied almost universally to idiots, insane persons, and minors, upon the ground that they lack the requisite judgment and discretion which fit them for its exercise. It has never been considered that any of these disqualifications were imposed as a punishment, and no one has thought to view them as even in the nature of a penalty. The same may be asserted as to the exclusion of unnaturalized citizens who are disqualified on the ground of alienage, and of paupers, to whom some States deny the right upon principles of State policy. It is quite common also to deny the right of suffrage, in the various American States, to such as have been convicted of infamous crimes. The manifest purpose is to preserve the purity of the ballot box, which is the only sure foundation of republican liberty, and which needs protection against the invasion of corruption, just as much as against that of ignorance, incapacity, or tyranny. The evil infection of the one is not more fatal than that of the other. The presumption is, that one rendered infamous by conviction of felony, or other base offense indicative of great moral turpitude, is unfit to exercise the privilege of suffrage, or to hold office, upon terms of equality with freemen who are clothed by the State with the toga of political citizenship. It is proper, therefore, that this class should be denied a right, the exercise of which might sometimes hazard the welfare of communities, if not that of the State itself, at least in close political contests. The exclusion must for this reason be adjudged a mere disqualification, imposed for protection, and not for punishment—withholding an honorable privilege, and not denying a. personal right or attribute of personal liberty.—Pomeroy on Cons. Law, § 535 ; *Anderson v. Baker*, 23 Md. 531 ; *Blair v. Ridgely*, 41 Mo. 63 ; *Ex parte Stratton*, 1 West Va. 305 ; *Kring v. Missouri*, 107 U. S. 221.

The clause of the Constitution, which we are now considering, can not, for the foregoing reasons, be considered as either an *ex post facto* law, within the prohibition of section 10, article 1, of the United States Constitution, or as in the nature of a bill of attainder. It is free from the latter objection on the ground that it requires a conviction in the due course of judicial proceedings before disfranchisement is made to attach. 2 Story's Const. § 1344 ; *Martin v. Snowden*, 18 Gratt. (Va.) 100. It is not an *ex post facto* law because it neither takes away a legal right, nor imposes any legal burden, one of which is necessary to the infliction of a penalty. It merely withholds a constitutional privilege, which is grantable or revocable by the sovereign power of the State at pleasure. In this particular the case differs from that of *Ex parte Garland*, 4 Wall. 333, and *Cummings v. The State of Missouri*, *Ib.* 277, where

[Washington v. The State.]

a test-oath, obviously punitive in its nature, was held to be unconstitutional, so far as it was required as a prerequisite for the exercise of an ordinary calling, as that of an attorney at law or of a clergyman. The right to exercise these callings was a natural right, which was not conferred by government, but would exist without it, although the subject of legislative regulation. It was a valuable attribute of personal liberty in the nature of property, the deprivation of which was punitive in its character.—Sedgw. on Stat. & Cons. Law (2d Ed., Pomeroy's), p. 558, *note*; Brightley's Elec. Cases, 97, *note*; McCreary on Elec. (2d Ed.) §§ 31–32. Upon a like principle is based the ruling of the United States Supreme Court in another case, where a State statute was held void which excluded persons from the privilege of sustaining suits in the courts of the State, or from making application for rehearings, except upon condition of taking an expurgatory oath, that they had never engaged in hostile measures against the Government.—*Pierce v. Carskadon*, 16 Wall. 234. The fact that no one can exercise the elective franchise unless it is affirmatively and expressly conferred by the constitution or laws of a State, as Mr. Pomeroy observes, shows at once and of itself, "that the voter possesses a mere privilege; that the States have supreme control over this privilege; that taking it away, or what is the same thing, refusing to confer it, does not impair a right, and can not be regarded as a penalty or punishment."—Pomeroy's Cons. Law, § 535.

We may further observe, what follows from the foregoing views, that there can be no such thing as a vested right in the elective franchise as against the State, or people, from which it was *ex gratia* derived, for, under our form of civil polity, all political power is inherent in the people, and "they have," in the language of the Constitution, "at all times an inalienable right to change their form of government, in such manner as they may deem expedient."—Const. 1875, Art. 1, § 3.

These reasons induce us to the conclusion that the framers of the Constitution intended to disqualify from participation in the elective franchise all persons previously convicted of larceny, and other crimes specified, as well as those convicted subsequently to the date of the adoption of that instrument. They both alike come within the letter, as well as the spirit of its provisions touching the subject of suffrage and elections. The mischief to be remedied is not of greater magnitude in the one case than in the other. And as all the provisions of a Constitution must go into effect as a whole, and at the time of its final adoption, unless otherwise declared, no reason appears to us why the operation of the one under consideration should be postponed by judicial construction.

[Montgomery & Eufaula Railway Company v. Culver.]

We discover no error in the ruling of the circuit court, instructing the jury to find the defendant guilty if they believed the evidence; and its judgment is affirmed.