# State, *ex rel.* Brassell *v.* Teasley, Judge.

## *Mandamus.*

(Decided June 17, 1915.　Rehearing denied June 30, 1915.
69 South. 723.)

1. *Municipal Corporations; Officers; Qualifications.*—The matter of being a candidate being a mere privilege and not a right, the provisions of Acts 1915, p. 52, amending Acts 1911, p. 289, that no person shall be eligible to office of president or member of the board of commissioners who shall, either by election or appointment, have held the office of president, or member of the board of commissioners for three consecutive years within four years immediately preceding the date of the election, is not unconstitutional as exceeding the power of the legislature to fix the qualifications for the office of city commissioner.

2. *Constitutional Law; Ex Post Facto; Officers; Qualifications.*— Such a provision is not violative of section 22, Constitution 1901, nor of section 10, article 1, of the Federal Constitution, since an ex post facto law is one which imposes a punishment for an act which is not punishable when it was committed, or imposes additional punishment or changes the rules of evidence by which less or different testimony is sufficient.

3. *Statutes; Title.*—Acts 1915, p. 52, does not violate section 45, Constitution 1901, requiring that each law shall contain one subject which shall be clearly expressed in its title.

[State, ex rel. Brassell v. Teasley, Judge.]

4. *Municipal Corporation; Officers; Qualification.*—When applied to a candidate for office, who has held the office of city commissioner for two and a half years before the statute was passed, the statute providing that no person shall be eligible to the office of commissioner who has held such office for three consecutive years, within the four years immediately preceding the date of the election, is not invalid as being retroactive.

(Mayfield, Sayre and Somerville, JJ., dissent.)

APPEAL from Montgomery City Court.

Heard before Hon. C. P. MCINTYRE.

Petition by the State on the relation of W. R. Brassell for mandamus requiring C. B. Teasley as probate judge of Montgomery county to receive and file the statement and petition of Walter R. Brassell to have his name placed on the ballot for city commissioner of the city of Montgomery. From an order denying the writ and declining to award the rule, petitioner appeals. Affirmed.

W. A. GUNTER, EVANS & PARRISH, and E. S. WATTS, for appellant. Appellant relies on the following points and authorities, which are directed to be set out:

1. The Legislature had no authority, by enacting Acts 1915, p. 52; § 11, amending Acts 1911, p. 289, to require a qualification to the right to hold office as president or member of the board of commissioners that one has not for three consecutive years within the four years immediately preceding the election for members of such board held the office as president or member of the board of commissioners.—*Kentz v. Mobile,* 120 Ala. 623, 24 South. 952; *Finklea v. Farrish,* 160 Ala. 230-236, 49 South. 366; 36 Cyc. 1122; *Nolen v. State,* 118 Ala. 154, 24 South. 251; *Touart v. State,* 173 Ala. 453-461, 56 South. 211; Sections 116, 173-176, Constitution; 8 Cyc. 279.

II. Section 11 of such act violates Const. Ala. § 22, and Const. U. S. § 10, art. 1. It is an ex post facto

law.—*Dorsey's Case*, 7 Port. 293; *State v. Buckley*, 54 Ala. 599; *Cummings v. Missouri*, 4 Wall. 277, 18 L. Ed. 356; *Ex parte Wm. Law*, 35 Ga. 303, Fed. Cas. No. 8,126; *Impeachment of Andrew Jackson;* Rev. Code, 275; *United States v. Reese*, 92 U. S. 214, 23 L. Ed. 563; *James v. Bowman*, 109 U. S. 127, 23 Sup: Ct. 678, 47 L. Ed. 979.

III. Said section 11 violates Const. § 45.—*Lindsay v. United States S. & L. Ass'n*, 120 Ala. 156-175, 24 South. 171, 42 L. R. A. 783.

IV. Section 11 of such act must be construed to apply to the commissioners hereafter elected or appointed.— *In re Strawbridge & Mays*, 39 Ala. 367; *Boyce v. Holmes*, 2 Ala. 54; *Barnes v. Mobile*, 19 Ala. 707; *Elliott v. Mayfield*, 4 Ala. 417; *Bradford v. Barclay*, 42 Ala. 375; *Chapman v. Holmes*, 10 N. J. Law, 20; *National Sewing Machine Co. v. Wilcox*, 74 Fed. 557, 20 C. C. A. 654; *State v. Hartford Fire Ins. Co.*, 99 Ala. 221-225, 13 South. 362.

HILL, HILL, WHITING & STERN, for appellee.

Upon consideration of this appeal by the full bench and without a previously prepared opinion in the cause, Justice McCLELLAN was directed by the court to prepare the following opinion expressing the court's views and conclusions on the appeal.

This is an appeal from an order of the associate judge of the city court of Montgomery declining to award a rule nisi to the judge of probate of Montgomery county, "requiring him to show cause why he should not receive and file the statement and petition of Walter R. Brassell to have his name placed upon the ballot to be used at the election to be held in the city of Montgomery on the third Monday in September next after the date hereof for commissioner for the city of Montgom-

ery, which said original statement and petition is attached to the petition" for the rule nisi. The judge of probate refused to receive and file said statement and petition. The associate judge responded to the petition for the rule as follows: "Now upon consideration the undersigned doth hereby refuse to grant said rule nisi, addressed to the said Teasley [the judge of probate], as prayed for by the petition herein, for the reason upon which the said Teasley himself acted, namely, that it appears from said statement that the said Walter R. Brassell has held by appointment the office of commissioner for Montgomery for three consecutive years just preceding the presentation of said statement and petition.

"This 31st day of May, 1915."

The ground or basis upon which the declination of the judge of probate to receive said statement and petition was rested, as well as the reason upon which the associate judge refused the rule nisi to the judge of probate, is found in section 11 of the amendatory act, applicable to the government of the city of Montgomery, passed, over the veto of the Governor, on February 5, 1915 (Acts 1915, p. 52). The provision of section 11 in question is as follows: "No person shall be eligible to the office of president or member of the board of commissioners  *  *  *  who shall, either by election or appointment, have held the office of president or member of the board of commissioners of any such city, three consecutive years, within the four years immediately preceding the date of the election for members of the board of commissioners."

The title of the amendatory act, of which section 11 is a part, is as follows: "To amend an act entitled 'An act to provide and create a commission form of munici-

pal government and to establish same in all cities of Alabama which now have or which may hereafter have a population of as much as twenty-five thousand and less than fifty thousand people, according to the last federal census, or any such census which may hereafter be taken; *to regulate the selection and election of commissioners* and their terms of office and recall from office; to fix their powers, duties and compensation; to punish improper conduct in connection with elections and petitions hereunder; to abolish police commissioners, aldermen and certain other city officials, and otherwise provide for the creation and maintenance of said commission form of government,' approved April 6, 1911."

The contention is that the quoted feature of section 11 is unconstitutional and void, if applied to the election in September, 1915, and to the petitioner, who is within the terms of the provision, having held the office, for which he would be a candidate for nomination and election at the September, 1915, election, by appointment, for the period mentioned in section 11.

We cannot do better than to set out in the opinion the four grounds or reasons succinctly set out in the brief for appellant, Brassell. The report of the appeal will contain the authorities relied on by appellant, referring them to the appropriate points of contention to be quoted. These reasons or grounds are as follows: "I. The Legislature was and is without authority to make as a qualification to the right to hold office as president or member of the board of commissioners that one has not for three consecutive years immediately preceding the date of the election for members of the board of commissioners, held the office as president or member of the board of commissioners. * * *

"II. Said part of said section 11 is violative of section 22 of the Constitution of Alabama and article 1 of section 10 of the federal Constitution. It is an ex post facto law.  *  *  *

"III. Said part of said section 11 is violative of section 45 of the Constitution of Alabama, in that the title is prospective, while, the subject-matter is ex post facto or retrospective.  *  *  *

"IV. Said part of said section, if not bad on account of the grounds assigned above, must be construed to apply to the commissioners 'hereafter' elected or appointed. *  *  * "

(1) 1. Proposition 1 cannot be approved in view of the apt authority afforded by the decision in *Finklea v. Farrish,* 160 Ala. 230, 49 South. 366. It was there held that the change wrought, from the Constitution of 1875 in respect of the qualifications or eligibility of persons to hold office, by the Constitution of 1901 in that regard, "evidenced a purpose to change the policy of the state, to avoid implications adjudged to arise out of such sections (enumerated above in that opinion) in *Dorsey's Case,* 7 Port. 293, and in *Kentz v. Mobile,* 120 Ala. 623, 24 South. 952, to have general qualifications for office, other than those enumerated in section 60, to the discretion and determination of the Legislature." The two cases just referred to in the quotation are those chiefly relied upon to justify the first proposition of the appellant. As seen, they are not authority under the present organic law. There is nothing in the Constitution of 1901 which, directly or indirectly, restricts the right of the Legislature to fix the qualifications to hold the municipal office of city commissioner.

(2) 2. The second proposition of appellant is not tenable, for the reason that section 11 is not within the

class called ex post facto laws. There are various definitions of such laws, a number of which are noted in 8 Cyc. p. 1027. We take that set forth in the text as satisfactory, though others are, doubtless, equally as well phrased: "An ex post facto law is one which imposes a punishment for an act which was not punishable when it was committed, imposes additional punishment, or changes the rules of evidence, by which less or different testimony is sufficient to convict."

The prohibition against the passage of ex post facto laws only applies to penal or criminal matters.—*Calder v. Bull,* 3 Dall. 386, 1 L. Ed. 648; *Bloodgood v. Cammack,* 5 Stew. & P. 276, 280; *Aldridge v. Railway Co.,* 2 Stew. & P. 199, 23 Am. Dec. 307; *Washington v. State,* 75 Ala. 582, 585, 51 Am. Rep. 479; 8 Cyc. pp. 1028, 1029. Section 11 of the law in question "neither takes away a legal right nor imposes a legal burden, one of which is necessary to the infliction of a penalty" or the imposition of a punishment.—*Washington v. State,* 75 Ala. 582, 51 Am. Rep. 479. The Legislature has, as to the municipal office in question, an unrestricted discretion as to what shall be the qualifications for such office. The exercise of this discretion, through an otherwise valid enactment, is not the imposition of a punishment upon the appellant, but the visitation, by the Legislature, of its power to prescribe the qualifications for tenants of the office of city commissioner. The petitioner did not have, nor has he now, any vested or other character of right that would or could be infringed or impaired by the legislative prescription of qualifications for this office that would exclude the petitioner from the privilege of holding the office.—*Washington v. State, supra.*

(3) 3. The third proposition is rested for authority upon *Lindsay v. U. S. Loan Association,* 120 Ala. 156,

175, 24 South. 171, 42 L. R. A. 783. If that decision has basis for application to the enactment under review it would compel the conclusion there set forth, viz., that a title of an act which manifests no purpose or intent to treat or to affect, in the body of the act, past transactions or to legislate to a "retrospective" effect is not a sufficient compliance with section 45 of the Constitution of 1901 which reads as here pertinent: "Each law shall contain but one subject, which shall be clearly expressed in its title.   *   *   *"

A statement of the subject-matter of the ruling made in that case will demonstrate its complete inapplication to the matter of controversy presented on this appeal. In *Jordan v. McClure Co.*, 170 Ala. 289, 321, 54 South. 415, 424, reference was made to the *Lindsay Case*, and this cautionary remark was well interposed: "We have no criticism to make of what is said in that opinion about retrospective logrolling and hodgepodge legislation; but it, like all other decisions, should be confined to the cases in hand, or those put in the decisions."

The case, in the presently pertinent particular, is thus accurately stated by Brickell, C. J. (120 Ala. 171, 172, 24 South. 176 [42 L. R. A. 783]) : "The further insistence of the appellant is that *legalizing past transactions* —the purging from the taint of usury the particular transactions to which the fifth section refers—is not a subject expressed in the title of the act of which it forms a part, and is offensive, therefore, to the clause" just before quoted from section 45 of the Constitution of 1901.  (Italics supplied.)

The Chief Justice proceeds: "The title of the act is of rather peculiar construction. First, as is more usual, general words are employed to express the subject— 'To regulate the business of building and loan associa-

tions in this state.' These general words are succeeded by an abstract or catalogue of the contents of the act, expressive of the matter of each section (except the repealing clause of laws in conflict with the act), descending to the section declaring that the act should take effect immediately on its passage and approval. The part or clause of the title to which the fifth section must be referred—for there is no other to which it can be referred—reads: 'Defining premiums, fines and stock taken to represent premiums.'"

It thus appears that the body of the act (section 5) undertook to validate—"to purge from the taint of usury"—past transactions, to render valid contracts already entered into and binding upon the parties before the act was passed, when the only particular feature of the title to which that provision (in section 5) could be referred was in these words: "Defining premiums, fines and stock taken to represent premiums.'"

Subsequently, in the opinion, it was expressly ruled (120 Ala. 176, 24 South. 171, 42 L. R. A. 783) that the effect of the body of the act, as there involved, was to have a "retrospective" operation upon "past transactions." The court, therefore, held that the act (section 5) was partially void, because the title did not comprehend an application of its provisions (section 5) to "past transactions," and it was condemned (120 Ala. 177, 24 South. 171, 42 L. R. A. 783) "in so far as the past transactions of the association are attempted to be legalized." It is plain that the subject of the "expository" act (section 5) was a matter in the past only, and that, so far as those past transactions were concerned, it could not operate, in the then present or future, except as an attempt to give a certain legal effect, defined in the act, to contracts already executed,

and to thereby change the obligations of the parties 'to contracts already marking and establishing the obligations of the parties.

The act under consideration, as respects its title and the quoted provisions of section 11, is not a retrospective law, as the court found the law to be in the *Lindsay Case*. The law there in question could not operate, and patently was not intended to operate, upon any past election for city commissioner in the municipality of Montgomery, by prescribing the qualifications of persons eligible to hold that municipal office under an election to be held in the future. The law (section 11) was obviously only intended to operate, to fix qualifications, in the future; that is, after it became effective as a statute of the state. What section 11 does is to fix, for a future election, a qualification for election to that municipal office—a qualification based upon tenure of the office for "three consecutive years, within. four years immediately preceding the date of election for members of the board of commissioners." The governmental theory or principle to which this provision may be referable is that given effect in our Constitution in the particulars wherein certain executive officers are restricted to one term; and this upon the notion that the occupant of such an office may be relieved of any temptation to so conduct or use its functions or opportunities as to contribute to his recommission thereto.

Now as to the title: The particular feature thereof —aside from any other that might be asserted as comprehending the phase of the subject of the act affected by section 11—is in these words, italicized before herein in the appropriate connection: " * * * To regulate the selection and election of commissioners. * * * ". Do these words in the title answer the pre-

scription of section 45 of the Constitution, which requires that "each law shall contain but one subject, which shall be clearly expressed in its title?" In *Hubbard v. State,* 172 Ala. 377, 55 South. 615, this correct statement was approvingly quoted: " * * * The title may be so written as to form an index to the provisions of the body of the act; but if only one subject-matter is the essence of the act, and its provisions are refererable and cognate to the general subject, the constitutional mandate is not violated. In short, the Constitution is not offended if the act has but one general subject, and that is fairly indicated by the title."

To like effect is the recent case of *State ex rel v. Board of Commissioners,* 180 Ala. 489, 499, 500, 61 South. 371. There, as here, the first expression in the title was general and comprehensive, that being followed, as here, by subdivisions of the title. It was there said of the subdivision: "The several subdivisions of this title are all germane to one another, and might well have been grouped under the broader subject of highways in Mobile county."

Here the title's opening sentence announced the legislative purpose to amend an act entitled "An act to provide and create a commission form of municipal government and to establish same in all cities" of a certain class, and then follows the particular expression with reference to the "selection and·election" of commissioners. Manifestly the "selection and election" of commissioners is referable, germane, and cognate to the single subject first mentioned in the title and treated in the body of the act, viz., the provision for creation and establishment of a commission form of government in cities of a certain class.

The case of *State ex rel Thomas v. Gunter,* 170 Ala. 165, 174, 54 South. 283, 285, is an apt authority upon

[State, ex rel. Brassell v. Teasley, Judge.]

the question now under consideration. The entire title of that act was this: "An act to make the judge of the city court of Montgomery, and the associate judge of the city court of Montgomery, elective by the people." —Acts 1907, p. 517.

The act in its body changed the term of the office. This court, without division, ruled as follows (omitting the citation of authorities) : "The next insistence is that the act of 1907 violates section 45 of the Constitution, in that it contains more than one subject, or, if it contains but one subject, it is not clearly expressed in the title. While the act deals with two judges, they are officials of the same court, and are so akin or so closely allied with each other as to be one and the same subject. In dealing with titles to acts, this court has often held that section 45 is complied with if the title is single in subject and expression and the details of the law embrace matters relevant and pertinent, or, as is more comprehensively said, germane or cognate, to the title subject. If the object or subject is stated generally in the title, it would include incidents and subsidiary details, and the title in question purports to deal with the selection of judges, and we think the fixing of the term of office, the length of and the commencement of same, is incidental and subsidiary to the subject, as expressed in the title, and which said title was not used in a restrictive sense. * * * The fixing of the term of office of the judges being germane to the subject of selecting them, it matters not whether the term so fixed infringed upon the existing term or not, as the title was sufficient to inform the Legislature and the public that the act provided a new method of selecting the judges of the city court, and would deal with the terms they were to hold, and, if the terms so fixed

would encroach upon existing terms, the title was sufficient to notify all parties at interest that the term of office would be dealt with, and when the new terms would commence, whether before or after the expiration of existing terms.   *   *   *   The act in question is unlike the one condemned in the case of *Lindsay v. United States Co.*, 120 Ala. 156, 24 South. 171, 42 L. R. A. 783. The act there sought to legalize past transactions, and was held to be beyond the contemplation of the title, while the title of the act of 1879, and which is quite similar to the present title, was held to be broad enough to cover the appointment and selection of judges, as well as the fixing of the term of office, in the case of *Winter v. Sayre* [118 Ala. 1, 24 South. 89] supra, and in the opinion by Brickell, C. J., who was the writer also of the opinion in the *Lindsay Case, supra.* So, too, does the present act find support in the case of *Carter v. Price* [50 Ala. 568], supra, and which has never been overruled or criticized so far as we have been able to discover."

Certainly if the title involved in *State ex rel. Thomas v. Gunter, supra,* was sufficient to comprehend, within the prescription of the Constitution (section 45), legislation materially affecting the term of the office there in question, when the title only referred to the mode of election, the title here, referring as it does to the regulation of the "selection and election" of the commissioners, necessarily comprehends the qualifications or eligibility of persons for election to that municipal office. If the title in the former case was sufficient to justify provisions, in the body of the law, affecting or changing the term of the office, it would seem to be beyond possible question, unless the former decision is to be overruled, that the title here involved was suffi-

cient to justify, in the body of the law, the prescription of qualifications for those eligible to election to the office.

(4) But it is urged that the law (section 11) is retroactive if it is applicable or is applied to the petitioner in the election to be held in September, 1915, who will have held the office, by appointment for 3 consecutive years immediately preceding that election, and that his unbroken tenure, for or on which he is disqualified by section 11 to be elected to the office, antedates the enactment by about 2½ of the 3 years prescribed; and that the title is not fairly susceptible of a construction or interpretation which would accord to it an effect to advise its readers or the lawmakers of an intent to deal in the act with "past transactions" or past facts. As has been before indicated, we feel certain that section 11 is not a retroactive law. This section visits no punishment. It is not an ex post facto law. It governs a subject, viz., qualification for a municipal office, over which the Legislature has a discretion, not restricted by the Constitution.—*Finklea v. Farrish, supra.* In determining the qualification, as written in section 11, the lawmakers looked back of the dates of their legislation in this regard, and based a qualification for future eligibility to the office upon a past fact, viz., tenure thereof for the time prescribed immediately preceding the election. That is the doctrine underlying *Washington v. State, supra,* where even a past conviction of crime was held not to be an improper or invalid reason or ground on which to deny the privilege of the ballot. A striking illustration of the confirmation of the validity of laws which base a rule for future action, or affecting future conduct, even with reference to an honorable profession, upon a past fact, is found in *Hawker v. New*

*York,* 170 U. S. 189, 18 Sup. Ct. 573, 42 L. Ed. 1002, in which our *Washington Case* is approvingly cited. There the Supreme Court vindicated a law that even based a disqualification for license to practice a profession upon a past fact; the court giving effect to the view that, unless otherwise restrained, the lawmakers may accept and establish, as a condition to disqualification for license fixed by the enactment, a rule of disqualification predicated of their conception of the evidential effect of past conduct to show that one committing it was not a proper person to practice the profession in question, and this in a case where the person had paid the penalty of the law in effect when he offended. Here the basis of the disqualification is not any moral or legal offense on the part of any one within the terms of section 11. That section must be attributed to a purpose to make a governmental regulation as upon a notion (whether well or ill founded we cannot and do not even consider) that the better public service may be secured by the rule set up by section 11; that this notion should be given effect upon any now in office who are within the terms of section 11. The legislative discretion and judgment has been expressed in section 11, and this court cannot annul it, in such circumstances, without departing from the sphere of its functions and powers.

Unless there is something in the law itself or in the Constitution, which commands or requires an interpretation or construction that would suspend the law or put it into effect, in whole or in part, at a more remote date, it is always held that, after a law is enacted, it is applicable and applies to the first subject-matter upon which it may operate under its terms, thereby giving effect to the intention of the lawmakers. In sec-

[State, ex rel. Brassell v. Teasley, Judge.]

tion 28 it is expressly provided: "This act shall take effect immediately." There is nothing in this which would justify the court in holding that section 11 was not operative to fix the qualifications for the office for the election to be held in September, 1915. There is an argument, predicated of the assumed application of the *Lindsay Case,* that the title was, as respects the provisions of section 11, liable to the charge that "surprise or fraud upon the Legislature" might have been a result, because the title did not specifically note the fact or rule spoken by section 11. This argument is entirely refuted by the fact that the Chief Executive, under and according to the authority of section 125 of the Constitution, formally communicated to the Legislature his dissenting views with respect to the wisdom, propriety, etc., of the provisions of section 11 of this act, and, in accordance therewith, proposed, as he may under section 125 of the organic law, a specific amendment which, if accepted by the lawmakers, would have eliminted the qualification for the office set up in section 11. Notwithstanding this disappoval of section 11 by the Executive, and notwithstanding the amendment he proposed, the Legislature repassed the bill, including section 11, and thereby made it a law. It is certain, under the circumstances stated, that the lawmakers were fully aware that section 11 was what it is.

We see no error in the conclusion given effect by the associate judge in his refusal of the rule nisi. His order or judgment, therefore, must be affirmed.

Affirmed.

ANDERSON, C. J., and GARDNER and THOMAS, JJ., concur. MAYFIELD, SAYRE, and SOMERVILLE, JJ., dissent.

ON REHEARING.

McCLELLAN, J.—In paragraph 2 of the foregoing opinion this expression occurs: "The Legislature has, as to the municipal office in question, an unrestricted discretion as to what shall be the qualifications for such office."

One of the counsel filing a brief for the appellant has seized upon the word "unrestricted" in that sentence, and from that as a premise has asserted that this court must, if it adheres to its views as expressed in the foregoing opinion, hold to be valid an imagined legislative act that might base qualifications for municipal offices or officers upon fanciful, if not absurd, grounds. To that character of argument response may be made in the language employed by this court, in reply to a like argument, in *Dorman's Case,* 34 Ala. 245: "But it is sufficient to say that the General Assembly has not, in fact, done what it is suggested it may hereafter do. We are here to decide actual, not possible, cases. All that we can or ought to do is to determine whether this particular law is constitutional. We are certainly not prepared to hold that a Legislature shall not exercise a constitutional power to any extent, because some succeeding General Assembly may exercise it beyond the proper limit. That would be to say that a lawful power must not be used at all, because it may be abused."

In the *Finklea-Farrish Case,* 160 Ala. 230, 49 South. 366, it was expressly ruled that, except as restrained by section 60 of the Constitution of 1901, the establishment of general qualifications for office was left "to the discretion and determination of the Legislature," and that sound expression of constitutional rule then, and it now, consists, absolutely, with this statement of com-

pletely accepted rule in that decision, at page 235 of
160 Ala. at page 367 of 49 South.: "But this court has
for long stood by the doctrine that the Constitution is
not the source of legislative power, and there are no lim-
its to the legislative power of the state government save
such as are written upon the pages of its Constitution."

Certainly the court should not and will not be drawn
into the attitude of anticipating or presuming that the
Legislature will, in the future, undertake to enact any
law in conflict with the Constitution. A proper respect
on the part of this court for that department forbids
any such assumption, much less an anticipation that
that department will assume to give utter absurdities
the form of law.

The matter of being a candidate for municipal office
is not a vested right. It is a privilege only, that may
be affected by prescribing qualifications for eligibility
to hold that municipal office. Aptly pertinent, by way
of perfect analogy, to this matter, it was said in *Wash-
ington' Case,* 75 Ala. 584, 51 Am. Rep. 479, after point-
ing out that the ballot was a privilege only, not an "ab-
solute or natural right" (thus distinguishing, as was
therein done, *Ex parte Garland & Cummings v. Mis-
souri*) : "It is well settled, therefore, under our form of
government, that the right [to vote] is one conferred
by Constitutions and statutes, and is the subject of ex-
clusive regulation by the state, limited only by the pro-
visions of the fifteenth amendment to the Federal Con-
stitution, which prohibits any discrimination on account
of 'race, color, or previous condition of servitude.'
*   *   *  The states having the power to confer or to
withhold the right, in such manner as the people may
deem best for their welfare, it necessarily follows that
they may confer it upon such conditions or qualifica-

tions as they may see fit, subject only to the limitation above mentioned."

This being true as to the privilege of the ballot, and the matter of candidacy for municipal. office certainly occupying no higher sanctity or dignity, and the Constitution not prescribing or containing any exclusive limitation applicable to this municipal office, it is obvious that the Legislature has a discretion, in respect of qualifications for municipal office, which section 11 of the act under review does not offend.

The briefs for the applicant have been carefully read and considered. The conclusion remains as before. Hence the rehearing is denied.

ANDERSON, C. J., and GARDNER and THOMAS, JJ., concur.

SAYRE and SOMERVILLE, JJ., dissent, on the following grounds: Section 11 of the act, if held effective against the present incumbents, though not ex post facto, would be retroactive, for the reason that it would attach a new disability in respect of a past transaction or arising out of a past consideration; i. e., it would impose upon them a disability on the consideration that they held office before the passage of the act.—*Ex parte Buckley,* 53 Ala. 52; 36 Cyc. 1202, note 90, where many cases are cited. This section of the act does not operate upon any past election, true enough; but now for the first time, if construed as operative against appellant, it would impose upon him a disability on the sole consideration that he held office before the passage of the act. This, according to all the authorities, as we understand them, would make the section retroactive as against appellant. We do not find that the case of *Thomas v. Gunter,* 170 Ala. 165, 54 South. 283, has any

resemblance to the case in hand. The act under consideration in that case made the judges of the city court of Montgomery elective by the people, whereas they had previously been appointed by the Governor with the advice and consent of the Senate, and, incidentally, it curtailed the term of one of the judges. The Legislature had created the court, and its power to abolish the court and the judge's tenure was undeniable under our previous decisions. There was nothing retroactive in the statute. The ruling was that under a title "to make the judge elective" their terms might be fixed for the future, even though the result was to destroy the current term of one of the judges. But there is nothing in the opinion that squinted at the conclusion that under that title the Legislature might have declared the then incumbents ineligible for the reason that they had previously held office.

The court cannot say that there may not be sound public policy in such a provision operating generally upon persons otherwise eligible. This policy, in a limited application, is to be found in the Constitution, which provides in respect to a number of executive officers of the state that they shall not succeed themselves. The provision of section 11, if held applicable to the present incumbents, would not deny to them any vested or constitutional right.—*Finklea v. Farrish,* 160 Ala. 230, 49 South. 366. But it is neither remedial nor curative. On the contrary, construed as applying to them, it would single them out from among all persons otherwise eligible, and deny to them an honorable, it may even be said a valuable, privilege. Such statutes are not favored, they are strictly construed, and it is a sound rule of judicial construction that they shall be allowed to operate prospectively only, unless their terms show an un-

mistakable legislative intent that they shall be given a retroactive effect.—*Ex parte Buckley, supra.*

Moreover, as a result of the constitutional requirement that the subject of an act shall be clearly expressed in the title, the title becomes a part of the act to which the court must look in interpretation, and, further, the title may suffice to limit and restrain the enacting body of the law.—*Jones v. Stokes,* 179 Ala. 585, 60 South. 280. Now, while the future, and not the past, is the ordinary, usual field and scope of legislation, the title of this act gives no intimation that a retroactive provision is to be found in its body, and to hold that the provision under consideration was intended to have retroactive operation would be to hold the provision unconstitional (*Lindsay v. U. S. Savings Ass'n,* 120 Ala. 156, 24 South. 171, 42 L. R. A. 783), and, result in its complete elimination from the act( *State v. Street,* 117 Ala. 212, 23 South. 807; *Browne v. Mobile,* 122 Ala. 159, 25 South. 223). But that, too, is a conclusion to be avoided. Reading, therefore, the body of the act with reference to the limitations imposed upon it by the title, and in view of the principle that an act will not be construed into unconstitutionality, if another construction be possible, our opinion is that the commissioners now in office are eligible for re-election.

MAYFIELD, J.—(Dissenting.)—I cannot concur in the decision, nor with all the opinion, in this case. I do not believe it to be within legislative competency to arbitrarily deny to certain citizens mere privileges which are enjoyed by others of the same class. This, in my judgment, is the necessary effect of the decision though not of the opinion. It makes no difference whether the privileges are conferred by natural, civil, com-

[State, ex rel. Brassell v. Teasley, Judge.]

mon, constitutional, or statutory law; they cannot be taken arbitrarily from certain individuals, if others of the same class are allowed to enjoy them, without violating the constitution. Ours is "a government of laws, and not of men." I am, therefore, of the opinion that if the provisions of the act here in question are held to be lawful provisions, and to be retroactive, then four citizens of this state are deprived arbitrarily of rights, and denied privileges, which are enjoyed by all other citizens of the same class. I know the majority opinion does not concede, but denies, that the act is even retroactive; but to this I cannot agree, and shall try to state the reasons which induce me to believe it is retroactive.

I do not doubt, much less deny, the power of the Legislature to fix any reasonable qualifications upon the privilege of holding office, and to deny the privilege to any citizen who does not possess the qualifications so fixed; but I do deny the power of the Legislature to take arbitrarily from certain individuals privileges enjoyed by others of the same class. I do not believe that an act of the Legislature, attempting so to do, is made valid by a classification of the citizens which did not then, never did, and never can, apply to any other citizens than those intended to be discriminated against. Such I believe is the effect, if not the purpose, of the provisions of the act in question. Experience may demonstrate fitness or unfitness to discharge given official, or nonofficial, duties; but it certainly does not tend to disqualify one for the discharge of duties which he is accustomed to discharge; nor can it be for the public good to deny the right to those who have experience; and this is the only thing that distinguishes these four incumbents from other citizens qualified to be elected to

office. This is both an unwarranted and unreasonable classification.

The qualification for holding office must be a reasonable one; it cannot be an arbitrary or an unreasonable one. Is it a reasonable qualification to say that only inexperienced persons are eligible, or that three years' experience disqualifies? To give the law a prospective, and not a retrospective, operation, the qualification is reasonable, because the public is benefited thereby; the officer then has no temptation to use the office to perpetuate himself in office, or to build up a political machine at the expense of the public; this he knows when he accepts the office and assumes the burdens and duties; if, however, the law under which he was elected and has served allowed him to succeed himself, and he has served three years, that service cannot be improved, changed, or recalled by subsequent statutes. Such is not within legislative competency. Omnipotence itself cannot do this. The state having granted these four officers the right and privilege to hold these offices for four years, as well as the right to succeed themselves, and they having accepted the grant and served for three years, the state cannot now lawfully take from them the right to serve the remaining year, nor that to succeed themselves. As was said by Justice Johnston in the case of *Fletcher v. Peck*, 6 Cranch, 143, 3 L. Ed. 162, a state cannot revoke its grant. It cannot do so, from the reason and nature of things, which imposes "laws even on Deity." Marshall, C. J., spoke on the same subject as follows: "The principle asserted is that one Legislature is competent to repeal any act which a former Legislature was competent to pass, and that one Legislature cannot abridge the powers of a succeeding Legislature. The correctness of this principle, so far as respects gener-

[State, ex rel. Brassell v. Teasley, Judge.]

al legislation, can never be controverted. But, if an act be done under a law, a succeeding Legislature cannot undo it. The past cannot be recalled by the most absolute power."—6 Cranch, 136, 3 L. Ed. 162.

"It is, then, the unanimous opinion of the court that in this case, the estate having passed into the hands of a purchaser for a valuable consideration without notice, the state of Georgia was restrained, either by general principles which are too common to our free institutions, or by the particular provisions of the Constitution of the United States, from passing a law whereby the estate of the plaintiff in the premises so purchased could be constitutionally and legally impaired and rendered null and void."—6 Cranch, 139, 3 L. Ed. 162.

Here, the Legislature has attempted to do what the Legislature of Georgia attempted to do; that is, to make an act or deed void, when it was valid and lawful when done or executed. This the courts and text-writers say cannot be done lawfully and constitutionally, because "the past cannot be lawfully recalled by the most omnipotent power, and is contrary to the principles which are common to our free institutions."

It will be noticed that, if these four incumbents are disqualified from succeeding themselves, they are, a fortiori, disqualified from holding office for the remaining year. The disqualification is from holding office, and not from being a candidate thereto. I do not believe that any one will contend that the Legislature could constitutionally thus arbitrarily remove these men from office; yet if the statute applies to them, and to their present terms, then the attempt to remove them from office is more certain, looking to the language of the act, than is the attempt to prevent them from succeeding themselves. Moreover, I submit, if the Legislature can thus

arbitrarily deprive these four incumbents of the right or privilege to succeed themselves, then it can and has arbitrarily disqualified them from holding office for the remaining part of their terms.

I am not unmindful of other provisions of the act, which fix the term of office at four years, and which are therefore in conflict with this construction of the act; but the act certainly gets no virtue by being inconsistent with itself. The Legislature, of course, cannot constitutionally deprive a citizen of a vested right, by any kind of act, or of classification of persons or things, whether reasonable or unreasonable. It can, however, deprive him of a statutory right or privilege not vested, if for the public good, and if done by a classification of persons or things which is reasonable. It cannot, however, deprive him of a mere privilege or immunity, though for the public good, if done by means of a classification of persons or things which is arbitrary or unreasonable. This is not equal protection of the law; it is class legislation, which our Constitutions, state and federal, abhor.

The prime error in the majority opinion is in the failure to observe this distinction. Mr. Cooley well states the law when he says: "A statute would not be constitutional which should proscribe a class or a party for opinion's sake, or which should select particular individuals from a class or locality, and subject them to peculiar rules, or impose upon them special obligations or burdens, from which others in the same locality or class are exempt."—Const. Lim. (7th Ed.) pp. 556, 557.

A law directing all males in jail to have their hair cut to a uniform length of one inch, mentioning no persons, class, or race, other than males in jail, was held void, because it could not apply, and was not intended

[State, ex rel. Brassell v. Teasley, Judge.]

to apply, to any persons except the Chinamen who were in jail.—*Lin Sing v. Washburn,* 20 Cal. 534, *Brown v. Haywood,* 4 Heisk. (Tenn.) 363, and *Yick Wo's Case,* 118 U. S. 356, 6 Sup. Ct. 1064, 30 L. Ed. 220, collect many cases like the one in question. It is as certain that the provisions of the act in question, if given a retroactive effect, cannot apply to or include any person, except the four incumbents, as to eligibility to office at the next general election.

It may be an accepted theory that a citizen is not "punished," within the meaning of that word as used in Bill of Rights, § 7, when he is thus arbitrarily denied the right to be a candidate for one of the most honorable and lucrative offices; but the opinion and experience of all mankind is against the theory. I believe that the best-reasoned cases are against the "accepted theory," and are in line with the common experience of mankind. I believe that the genus homo of American citizenship, if it could speak, would say a man does suffer who is arbitrarily denied the right and privilege of holding one of the most honorable and lucrative offices in this state, or of being a candidate therefor. If *Dorsey,* of 7 Port. 293, *Cummings,* of 4 Wall. 277, 18 L. Ed. 356, and *Garland,* of 4 Wall. 333, 18 L. Ed. 366, were punished by the acts there under consideration, I fail to see why Brassell, of this case, is not punished by the act in question.

The following quotations are from *Hawker's Case,* 170 U. S. 203, 18 Sup. Ct. 573, 42 L. Ed. 1002: In *Cummings v. Missouri,* 4 Wall. 277, 321, 18 L. Ed. 356, the court said: "The theory upon which our political institutions rest is that all men have certain inalienable rights, that among these are life, liberty, and the pursuit of happiness, and that in the pursuit of happiness

all avocations, all honors, all positions, are alike open to every one, and that in the protection of these rights all are equal before the law. Any deprivation or suspension of any of these rights for past conduct is punishment, and can be in no otherwise defined."

In *Ex parte Garland,* 4 Wall. 333, 377, 18 L. Ed. 366, which involved the validity of an act of Congress requiring, among other things, a certain oath to be taken as a condition of the right of one to appear and be heard as an attorney at law by virtue of any previous admission to the bar, the United State Supreme Court, referring to certain clauses of the act relating to past conduct, said: "The statute is directed against parties who have offended in any of the particulars embraced by these clauses. And its object is to exclude them from the profession of the law, or at least from its practice in the court of the United States. As the oath prescribed cannot be taken by these parties, the act, as against them, operates as a legislative decree of perpetual exclusion. And exclusion from any of the professions or any of the ordinary avocations of life for past conduct can be regarded in no other light than as punishment for past conduct."

Our Bill of Rights provides, among other things: "That all men are equally free and independent; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness."

"No person shall be punished but by virtue of a law established and promulgated prior to the offense and legally applied."

"That the sole object and only legitimate end of government is to protect the citizen in the enjoyment of life, liberty, and property, and when the government as-

sumes other functions it is usurpation and oppression."

"That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government, and shall forever remain inviolate."

In *Dorsey's Case,* he was by the act in question, denied the right to practice law because he had sent a challenge to fight a duel, which was made a crime by the act, and the act because retrospective, or to the extent only in which it was retrospective, was held void, and it was then (in 1838) decided that: "The Declaration of Rights is the governing and controlling part of the Constitution, and with reference to this are all its general provisions to be expounded, and their operation extended or restrained. The Declaration itself is nothing more than an enumeration of certain rights, which are expressly retained and excepted out of the powers granted; but as it was impossible, in the nature of things, to provide for every case of exception, a general declaration was added, that the particular enumeration should not be construed to disparage or deny others retained by the people. What those other rights are, which are thus reserved, may be readily ascertained by a recurrence to the preamble to the Declaration of Rights. The object to be attained by the people, when assembled in convention, was not the formation of a mere government, because such might, and in many cases would, be arbitrary and tyrannical, although democratic in its form. It was to form a government with clearly defined and limited powers, in order that 'the general, great and essential principles of liberty and free government might be recognized and established.' The Gen-

eral Assembly is not expressly prohibited from enacting laws requiring political test oaths to be taken, nor from excluding some of its citizens from the pursuit of certain trades or avocations, yet no one would contend that any such laws could be operative, because it is evident that they are adverse to the principles of liberty and free government."

Is not the provision of the act in question, so far as this appellant is concerned, adverse to principles of liberty and free government? I ask, under the decision of the majority, is not appellant denied privileges which other citizens in the same class are allowed to enjoy, and so denied, not because of any wrong which he has done, but because he has done what the law authorized him to do?

In *Dorsey's Case*, it was further said, per Goldthwaite, J.: "I have arrived at the conclusion (satisfactory to myself, at least) that the authority to pass disqualifying laws, whether affecting the citizen as an individual, or as an officer, is derived from the sections of the Constitution quoted, and exists in no other cases. * * * I have omitted any argument to show that disqualification from office, or from the pursuit of a lawful avocation, is a punishment; that it is so is too evident to require any illustration; indeed, it may be questioned whether any ingenuity could devise any penalty which would operate more forcibly on society."—7 Port. 365, 366.

Similar language was used by the other Justices who wrote in this case, and if *Dorsey's Case* does not decide that disqualification for holding office on account of past acts, which were lawful when performed, is punishment, then I confess I do not understand the opinion, or the decision, the English language, or the Constitution.

[State, ex rel. Brassell v. Teasley, Judge.]

The cases relied upon in the majority opinion, in my judgment, are not in point, for the reason that the disqualifications in those cases were crimes and went to the character of the citizen, while the previous convictions or the past acts went only to the evidence to establish the crimes. This was emphasized in the majority opinion in *Hawker's Case,* 170 U. S. 196, 18 Sup. Ct. 573, 42 L. Ed. 1002, where it was said: "If the Legislature enacts that one who has been convicted of crime shall no longer engage in the practice of medicine, it is simply applying the doctrine of res judicata and invoking the conclusive adjudication of the fact that the man has violated the criminal law, and is presumptively, therefore, a man of such bad character as to render it unsafe to trust the lives and health of citizens to his care. That the form in which this legislation is cast suggests the idea of the imposition of an additional punishment for past offenses is not conclusive. We must look at the substance, and not the form, and the statute should be regarded as though it in terms declared that one who had violated the criminal laws of the state should be deemed of such bad character as to be unfit to practice medicine, and that the record of a trial and conviction should be conclusive evidence of such violation. All that is embraced in these propositions is condensed into the single clause of the statute, and it means that and nothing more. The state is not seeking to further punish a criminal, but only to protect its citizens from physicians of bad character. The vital matter is not the conviction, but the violation of law. The former is merely the prescribed evidence of the latter."

This same line of thought is applicable, and is controlling, in the other cases cited, including that of our

own court. Here appellant has committed no crime and no wrong, being a man of unimpeachable character, and his three years' experience in the office is the only reason assigned for disqualifying him. I submit that the reason is unnatural and arbitrary. What was said by Marshall, C. J., in *Fletcher v. Park,* 6 Cranch, 137, 138, 3 L. Ed. 162, is apt here and should be remembered: "Whatever respect might have been felt for the state sovereignties, it is not to be disguised that the framers of the Constitution viewed, with some apprehension, the violent acts which might grow out of the feelings of the moment, and that the people of the United States, in adopting that instrument, have manifested a determination to shield themselves and their property from the effects of those sudden and strong passions to which men are exposed. The restrictions on the legislative power of the states are obviously founded in this sentiment; and the Constitution of the United States contains what may be deemed a Bill of Rights for the people of each state [some of which are]: 'No state shall pass any bill of attainder, ex post facto law, or law impairing the obligation of contracts.'"—6 Cranch, 137, 138, 3 L. Ed. 162.

The act of Georgia, there being considered, was an act repealing an act of a former Legislature, which it had the undoubted right to do; but, in doing so, it, like the one in question, attempted to annul acts and deeds done under the former statute. As to such acts or deeds of the past, the court said the most omnipotent power could not recall the past, and make that void which was valid when done. That statute was not an ex post facto law, or a bill of attainder, nor did it attempt to impair the obligation of a contract; but the court said it had the same effect as laws of that kind, and was

[State, ex rel. Brassell v. Teasley, Judge.]

therefore void. So, in this case at hand, the act is not in terms within the letter of any of the acts expressly prohibited by the state or federal Constitutions, yet it is within the spirit of several of the provisions and attempts to do indirectly what the Constitutions say shall not be done.

I concede that offices are mere agencies of trust, and are not property, as between the officer and the state or the public, that unearned salaries or compensation are not property, and that officers have no contract right to hold or continue in office. I also agree that an office created by the Legislature, may, at the same will, be abolished by subsequent statute, and the term of office thereby extinguished, and the right to the salary destroyed; but a very different question is presented where the office is continued, and the officer arbitrarily removed, or arbitrarily declared ineligible. Due process and equality of the law prevent the Legislature from doing this. To deprive a citizen of a right or a privilege arbitrarily is to deprive him illegally; to so deprive him is injurious both to him and to the public. It was said in the former case of *Marbury v. Madison,* 1 Cranch, 137, 2 L. Ed. 60, that: "The very essence of civil liberty is the right of every individual to claim the protection of the law."

The Supreme Court of the United States and this court have frequently said that the Bills of Rights were intended to secure the individual from the arbitrary exercise of even the very powers of government which the people conferred on the government.—*Bank of Columbia v. Okely,* 4 Wheat. 244, 4 L. Ed. 559.

"For centuries Bills of Rights have been the English speaking peoples' chief defenders against the aggression and encroachments of all monarchs, crowns, and sover-

eigns upon the rights of the citizens. At the formation of all our American governments, these Bills of Rights were each named, selected, and reserved by the people who formed the government as the 'home guards' and 'defenders' to protect their lives, liberties, and properties from all illegal assaults by the government which they had created. To make doubly sure of this, they often inserted in their Constitutions provisions like 36 of ours, which reads as follows: 'That this enumeration of certain rights shall not impair or deny others retained by the people; and, to guard against any encroachments on the rights herein retained, we declare that everything in this Declaration of Rights is excepted out of the general powers of government and shall forever remain inviolate.' "

"These cardinal principles of the Magna Charta are memorable and revered, because of their assertion of precious truths, so necessary to the individual happiness, liberty, and life of the citizen. They are historic in their associations. They have served humanity faithfully as beacon lights in the progress of liberty and righteousness, and are the controlling parts of our fundamental law."

"Lord Chatham said that these provisions of the Magna Charta were worth all the classics, because they protected the personal liberty and property of all men, by giving security from arbitrary imprisonment and spoilation. He further said that to have procured this great charter, to have preserved and matured it, constituted the immortal claim of England upon the esteem of mankind. Under its provisions all persons, from those of the highest station to the humblest individual, are equally bound to render it obedience. All men and the sovereign are governed by this general law."—7 Mayf. Digest, 165.

[State, ex rel. Brassell v. Teasley, Judge.]

The very principle now contended for by me has been well decided and well expressed, and based on the same authority on which I base my conclusions. That court has said: "In *Commonwealth v. Jones,* 10 Bush (Ky.) 735, that court, referring to the provision in the Constitution of Kentucky depriving any person who fought a duel of the right to hold an office, said: 'It, in effect, dispossesses him of a right which the Supreme Court of the United States terms inalienable (4 Wall. 321, 18 L. Ed. 356), takes from him rights, privileges and immunities to which he was theretofore entitled, and strips him of one of the most valuable attributes of citizenship. The word 'deprived' is used in this section in the same sense in which it is used in section 12 of the Bill of Rights and in the fifth article of amendment to the federal Constitution.' "—*Taylor v. Beckham,* 178 U. S. 599, 20 Sup. Ct. 890, 1009, 44 L. Ed. 1187.

Judges Cooley and Story have construed the matter as follows, and I know of no better authority than these two, certainly when they agree. Judge Cooley, speaking for the Supreme Court of Michigan in *People v. Hurlbut,* 24 Mich. 44, 9 Am. Rep. 103, after observing that some things were too plain to be written, said: "Mr. Justice Story has well shown that constitutional freedom means something more than liberty permitted; it consists in the civil and political rights which are absolutely guaranteed, assured, and guarded, in one's liberties as a man and a citizen—his right to vote, his right to hold office, his right to worship God according to the dictates of his conscience, his equality with all others who are his fellow citizens. All these guarded and protected, and not held at the mercy and discretion of any one man or any popular majority.—Story, Miscellaneous Writings, 620. If these are not now the absolute

rights of the people of Michigan, they may be allowed more liberty of action and more privileges, but they are little nearer to constitutional freedom than Europe was when an imperial city sent out consuls to govern it."